UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Gregory Riley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-8221 |
| | ) | |
| Thomas Dart, Sheriff of Cook County, | ) | Judge Jorge L. Alonso |
| Cook County, Illinois, and | ) | |
| Dr. Melanie Watson-Montgomery, | ) | |
| | ) | |
| Defendants. | ) | |

**COOK COUNTY DEFENDANTS' AND SHERIFF'S RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(b)(3)(c) STATEMENT**

NOW COME the Defendants, Dr. Melanie Watson-Montgomery and the County of Cook, and the Sheriff of Cook County by and through their attorney, ANITA ALVAREZ, State's Attorney of Cook County, through her assistants, Assistant State's Attorney Maureen O. Hannon, and Nicholas Cummings and in answer to Plaintiff's Local Rule 56.1(a)(3)(c) Statement, state the following:

1. The Inter-Agency Agreement between the Sheriff of Cook County and the Cook County Health and Hospital System was entered on January 28, 2011. This agreement provides joint responsibility for each party to meet "the health care needs of detainees consistent with the safety and security of detainees and staff." (Plaintiff's Exhibit 1, Inter-Agency Agreement at 1.)

**ANSWER: Deny. The Inter-Agency agreement specifically reads "Cermak and CCDOC acknowledge their mutual responsibility and interdependence in meeting the health care needs consistent with the safety and security of detainees and staff." (Pl. Exh. 1 Inter-Agency Agreement, p. 1.)**

1

2. The Inter-Agency Agreement requires the Sheriff of Cook County to do the following:

 a. "Participate with Cermak in a coordinated approach to the delivery of health care to detainees" (Plaintiff's Exhibit 1 at 4);

 b. **"CCDOC will accommodate secured locked boxes in each living unit, and make readily available forms provided by Cermak, for use by detainees in making health care service request"** (*Id.* at 5);

 c. Hold at least quarterly meeting with Cermak "to address and resolve issues of joint concern" (*Id.* at 7) and

 d. May appoint a Medical Advocate to "identify health care concerns, to identify systems issues." (*Id.*).

**ANSWER:** **Admit that section a, b, c, d above are snippets from the interagency agreement.**

3. Sheriff Dart – who is employed by the Cook County Sheriff's Office and controls the Cook County Department of Corrections – is responsible for the health and well-being of inmates confined in the Jail. (*Evans v. Dart*, 2015 WL 9700000 at *1 (N.D.Ill. 2015) (Alonso, J.)**;** Plaintiff's Exhibit 2, Burke Rule 30(b)(6) Dep at 13-24-14:7; 14:21-15:1; 65:7-18; 112:23-113:16; 118:7-10.)

**ANSWER:** **Deny as worded because it is vague. Cermak Health Services which is a division of the Cook County Bureau of Health Services provides medical care. The Sheriff is the custodian of the Jail.**

4. Dart has authority to call outside dentists if Cook County is not able to provide prompt dental care. (Plaintiff's Exhibit 2, Burke Rule 30(b)(6) Dep 112:23-113:16; 118:7-10.)

**ANSWER:** **Deny. The testimony does not support the statement at all. The references cited address the ability of the Sheriff to call an ambulance and bypass Cermak "if**

2

**somebody was having a heart attack or if somebody attempted suicide….." (Ex. 2 page 112: 23, 113: 1-16)**

5. In 2007, the United States Department of Justice (the DOJ) conducted an investigation of the dental care provided at the Jail. (Plaintiff's Exhibit 3, DOJ Report at 57-58.) In 2008, the DOJ issued a report (i.e., the DOJ Report) addressed to Dart, which identified widespread and "alarming" problems with dental care at the Jail, including that inmates waited months to receive dental care. (*Id.* at 1, 57-58; Plaintiff's Exhibit 3, Burke Rule 30(b)(6) Dep 51:18-52:13.) Dart's Rule 30(b)(6) representative admitted that the DOJ Report was a "serious" matter. (Plaintiff's Exhibit 3, Burke Rule 30(b)(6) Dep at 55:13-15.)

**ANSWER: Deny that the DOJ conduced an "investigation of the dental care provided at the Jail and the pages referenced indicate the limited focus which the DOJ gave to dental care. Admit that Mr. Burke acknowledged that the July 9, 2008 DOJ Letter to the Sheriff and the County was a serious matter but aver that the dental staff by 2014 when Plaintiff was there was at optimum levels according to the district court in** *Smentek v. Dart***, 2014 U.S. Dist. LEXIS 175982 *30 (J. Lefkow N.D. Ill 2014)**

6. After receiving the DOJ Report and even after appearing in the *Sementek v. Dart*, Case No. 09-cv-529, Dart failed to do anything to investigate the truth of the findings in the DOJ Report (including the specific finding that a prisoner waited months for dental care) and did not take any steps to improve the inadequate dental care at the Jail. (Plaintiff's Exhibit 2, Burke Rule 30(b)(6) Dep 15:8-16:7; 21:17-22:15; 26:16-19; 36:4-18; 39:12-23; 47:16-48:10 50:6-52:22; 53:3-11; 55:7-56:5; 71:1-18; Plaintiff's Exhibit 4, Hart Dep. 23:9-25:5.)

**ANSWER:** Objection relevance. Dart has been individually dismissed from this suit so the actions or inactions of Dart are not at issue. Without waiving that objection, deny. The cited references do not support the statements. To the contrary the first referenced Ex 2 15: 8-16 states that the Sheriff's office provides a grievance process to alert the Sheriff to someone with dental concerns, they also transport the detainees to the dental clinic and Stroger. (Ex. 2 Burke 15:8-16) and further, "I don't know if that was ever the case where somebody wasn't getting access to dental care because there were dentists on staff with Cermak and my understanding is that inmates were routinely taken to dental appointments." Ex. 2 21:7-12. The only reference that comes close is

> Q: So we just discussed that dental care never came up in 2009 or 2010 at the Sheriff's accountability meetings. Did the Sheriff's office communicate regarding the quality of dental care with Cook County in any other way during that time frame?
>
> A. I don't know."

**Ex 2 39:9-15. Cermak, not the Sheriff had the responsibility of disputing the finding by Dr. Shansky in 2010, that in the DOJ's opinion, Cermak was not providing timely dental service. Ex. B 71-72) Further, when one of the dental divisions had facility issues the Sheriff asked the facilities director to come and tell him what was being done to improve the condition of that dental unit.(Pl Ex. 4 Hart 24:15-20) As of 2014, the dental staffing is optimal.** *(Smentek v. Dart 2014 U.S. Dist LEXIS 175982\*30)*

7. Among other things, Dart never asked any questions of Cermak's medical or dental directors, or any other person, regarding dental care at the Jail. (Plaintiff's Exhibit 2, Burke Rule 30(b)(6) Dep 15:8-16:7; 21:17-22:15; 26:16-19; 36:4-18; 39:12-23; 55:22-56:5;

71:1-18; Plaintiff's Exhibit 4, Hart Dep 23:9-25-5; Plaintiff's Exhibit 5, Townsend Dep. 43:16-45:9; 46:19-23; 50:12-24; 146:5-10.)

**ANSWER:** **Objection relevance. Dart has been individually dismissed from this suit so the actions or inactions of Dart are not at issue. Without waiving that objection, deny. See response above. In addition, Dr. Townsend, the dental director would speak to the medical director and the CO of Cermak about things that the justice department would be looking at with dental, not to Tom Dart. (Ex. 5 Townsend Dep 48:18-24).**

8. Dart did nothing to investigate how the number of dentists and oral surgeons on site at the Jail in 2009 and early 2010 compared to the number of dentists and oral surgeons on site at the Jail prior to the cuts to Cook County's budget in 2007. (Plaintiff's Exhibit 2, Burke Rule 30(b)(6) Dep 19:10-20; 21:17-22:15; 25:19-26:24; 60:18-61:15; 71:1-11.) Dart's Rule 30(b)(6) representative did not know that, according to Cermak's dental director, there were at least eight dentists and one oral surgeon on site at the Jail prior to the cuts to Cook County's budget in 2007, and there were only four dentists and no oral surgeons on site at the Jail in 2009 and early 2010. (*Id.* at 25:19-26:24; 60:18-61:15; 70:15:71:11; Plaintiff's Exhibit 5, Townsend Dep. 29:19-31:2; 33:18-34:1; 37:1-3.)

**ANSWER:** **Objection relevance. The number of dentists at Cermak in 2009 and 2010 has no bearing on the alleged delay in Plaintiff's routine extraction of a wisdom tooth by an oral surgeon at Stroger. Moreover, Dart has been dismissed from this suit so the actions or inactions of Dart are not relevant to the issues. Regarding the oral surgeon, Dr. Townsend said he wasn't sure but there may have been one before 2007. (Ex. 5, Townsend 33:18-24)**

5

9. Dart failed to conduct any investigation into dental staffing levels in 2009 and early 2010. Dart's Rule 30(b)(6) representative admitted, among other things, that this information was "important" for Dart to know and that the number of dentists was a "critical" factor in terms of providing adequate dental care. (Plaintiff's Exhibit 2, Burke Rule 30(b)(6) Dep 25:19-26:24; 71:12-18.) Had Dart conducted any investigation, he readily could have learned that, in 2009 and early 2010, Cermak's dental director consistently communicated the need for more dentist and an oral surgeon on site at the Jail. (Plaintiff's Exhibit 5, Townsend Dep 55:1-56:4; 116:16-20.)

**ANSWER: Objection relevance. Dart has been individually dismissed from this suit so the actions or inactions of Dart are not at issue. Without waiving that objection, deny that Dart failed to do anything. The number of employees in the dental department was a public record and specified in the budget every year and the staffing has increased each year. Deny that the referenced depositions support the statement but admit that Dr. Townsend stated that "it has always been on the agenda that we need an oral surgeon." Ex. 5 Townsend 55:20-24**

10. After receiving the DOJ Report in 2008 through at least early 2010 – Dart made no efforts to investigate whether there were any such delays in inmates' dental care at the Jail. (Plaintiff's Exhibit 2, Burke Dep 54:9-55:12; 65:7-23.)

**ANSWER: Deny that the referenced statements support the alleged fact. The Witnesses stated he did not know of any delays in 2009. "I don't know if we were aware that there were actual delays or if it was just the regular scheduling of appointments. I don't know. I'm in no position to characterize them as delays. (Ex. 2 Burke 65:1-5) And, "the Sheriff**

**would be concerned if there were delays causing pain and suffering. " By 2010 the staffing levels that Cermak had in 2006 had been restored by that period." (Ex. 2 Burke 65:10-24; 66:8-16). Further aver that this was not a problem across the board, Plaintiff testified that his delay was unique.**

> been done. Guys was on my wings with toothaches
> They were going up there and getting the shot in the
> thing and the tooth coming right out.
>     Me, I don't know why mine took so
> long. Why did I have to go through all this pain
> for that long period of time? What, eight, nine
> months? No. Nobody shouldn't have to go through
> that, for real.

**Dkt #51-2 Ex. A Riley dep at 81:1-8.**

11.     In 2009 and early 2010, Cermak's dental director strongly believed – and communicated the point – that employing an oral surgeon on site at the Jail was necessary to ensure that inmates received prompt dental treatment. (Plaintiff's Exhibit 5, Townsend Dep 53:6-54:3; 55:1-56:4.)

**ANSWER: Deny the characterization by Plaintiff, he misstates the record. Dr. Townsend stated that "it has always been on the agenda that we need an oral surgeon." Ex. 5 Townsend 55:20-24. In addition, Plaintiff testified that guys on his "wing" with a toothache were getting treated right away. Dkt #51-2 Ex. B Riley dep at 81:1-8.**

7

12. The Jail's lack of an oral surgeon on site delayed inmates' ability to obtain prompt oral surgery because Dart only transported a limited number of inmates from the Jail to outside hospitals each day and dental needs were often treated as a lower priority than other health care emergencies, which resulted in a "waiting list" to see the oral surgeon. (*Id.* at 37:1-3; 53:6-54:3; 61:2-62:19; 123:20-124:12.)

**ANSWER:** **Object to this argument. Nowhere is that argument stated by any witness. In addition, the testimony referenced, "that there were no oral surgeons on site" was in response to a questions about staffing in 2009 and 2010, not 2014. (Ex. 5, 37: 1-3) The testimony referenced was that there was a waiting list for the oral surgeon but there is no testimony to support Plaintiff's argument as to why that wait list existed. Plaintiff testified that guys on his "wing" were getting treatment for toothaches promptly. (Dkt #51-2, Ex.A Riley dep at 81:1-8.)**

13. As of March of 2016, the Jail remained without an oral surgeon at Cermak. (ECF No. 51-4 at 7, Watson-Montgomery Dep 16:3-18.) In 2014, the "need for an oral surgeon" was discussed by Dr. Jorelle Alexander, the System Director of Oral Health for the Cook County Health and Hospitals System. (*Id.* At 7-9, Watson-Montgomery Dep. 17:7-22:3; Plaintiff's Exhibit 6, Dr. Alexander email.) Dr. Watson-Montgomery believed there was a need for an oral surgeon at the Jail. (*Id.* at 8, Watson-Montgomery Dep. 22:5-8.)

**ANSWER:** **Admit, but aver that it does not follow that there is a constitutional obligation to provide an oral surgeon one as long as a detainees needs are taken care of by the defendants.**

14. Dental pain associated with tooth number 32 caused plaintiff tremendous pain; every day he wrapped a towel over his head to reduce the pain. (ECF No. 51-2 at 22, Riley Dep 80:2-23.)

**ANSWER: Deny that the pain was "tremendous." He refused topical anesthetic when offered (Dkt# 51-4 Ex. C Montgomery dep at 162:1-9); and after examining the patient and looking as his x-rays, neither the oral surgeon nor Dr. Montgomery, concluded that he was in need of urgent extraction. (51-4 Ex.104, 105 (Cermak records) and 118 of 132 (Stroger records))**

15. At least four or five times per week, plaintiff approached Dr. Watson-Montgomery when assigned to Division 10 complaining of tooth pain and the delay with seeing the oral surgeon. (ECF No. 52-2 at 21-23, Riley Dep 76:10-16; 78:17-81:8.) Dr. Watson-Montgomery continually told plaintiff there was nothing she could do, that he had to wait and would eventually be seen by the oral surgeon. (ECF No. 51-2 at 21-22, Riley Dep 76:25-77:21.)

**ANSWER: Deny. Plaintiff did not so testify. When asked how many times (in total) he allegedly saw Dr. Montgomery in the hallway, he answered "four or five times." Not four or five times "each week." (Dkt# 51-2 Ex. A Riley dep 78: 17-25) He testified that when she was going to lunch he would "see her in the hall" and she "was like, I don't have your file in front of me." (Riley dep 77:10-15) or he would say to her (from the hallway apparently) "did you forget about me" and she would say "you have an appointment I cannot tell you when for security reasons." (Riley dep 79:1-11).**

16. Plaintiff experienced "ongoing daily" pain ranked 10 on a scale of 1-10. (ECF No. 51-2 at 21, Riley Dep 75:24-76:5.) This tooth pain caused head pain (*id.* at 23, 83:10-11), limited plaintiff's ability to chew on one side of his mouth (*id.* at 21, 75:21-23), and interfered with plaintiff's ability to sleep (*Id.*)

**ANSWER: Admit Plaintiff so testified but aver that Dr. Montgomery and the oral surgeon at Stroger examined Plaintiff, took x-rays and concluded that there was no immediate need for extraction. Also in addition to renewing his prescription for ibuprofen, because Plaintiff refused the offer of topical anesthesia, she concluded he was not in unbearable pain. (Dkt#51-4 Ex C Montgomery 162:1-9; Ex. D at 9) She testified that the pain with a wisdom tooth is intermittent. (*Id.* Watson- Montgomery dep 147:9-12 and that he would not have been in pain continually. *Id.* Watson- Montgomery dep. 167:8-15)**

17. Dr. Watson-Montgomery made a medical record on January 17, 2014 that plaintiff Riley suffered a "toothache LR pain 9 on 1-10 scale" and made an "electronic referral to oral surgeon." (ECF No. 51-4 at 105, Exhibit to Watson-Montgomery Dep.) During this examination, Dr. Watson-Montgomery prescribed Plaintiff Amoxicillin and Motrin (*id.* at 106) for a diagnosis of gross decay and irreversible pulpits of tooth number 32 and explained the course of treatment required surgical extraction of tooth 32. (*Id.* at 26, Watson-Montgomery Dep 90:13-91:1; 51-4 at 104, Exhibit to Watson-Montgomery Dep.)

**ANSWER: Admit.**

18. Irreversible pulpitis is where the "nerve inside the tooth has had inflammation in it for such a long that the pulpitis is not reversible." (ECF No. 51-4 at 26, Watson-Montgomery

Dep 90:21-91:1.) Dr. Watson-Montgomery testified that a person with this condition would experience pain. (*Id.* at 26, Watson-Montgomery Dep 91:2-5.)

**ANSWER:** **Admit and aver that is why she gave plaintiff ibuprofen and an antibiotic and instructed him to come back in as needed ("PRN") while he waited for the extraction.**

19. Dr. Watson-Montgomery prescribes Amoxicillin to treat inflammation and infection. (ECF No. 51-4, Watson-Montgomery Dep 86:19-87:12.). It is typically prescribed for seven days because it is the recommended length of time. (*Id.*)

**ANSWER:** **Admit she would so prescribe, but she testified that she would not use the word infection but would use "inflammation." ( Dkt#51-4 Watson- Montgomery dep Ex. C pp 166-167.)**

20. Plaintiff's treatment for irreversible pulpitis of tooth 32 was not complete until the tooth was surgically removed. (ECF No. 51-5 at 44-45, Watson-Montgomery 165:21-166:5.)

**ANSWER: Admit.**

21. Dr. Watson-Montgomery made a medical record on August 4, 2014 that plaintiff Riley complained about waiting "a long time to have my back tooth out and it hurts bad." (ECF No. 51-4 at 109.)

**ANSWER: Admit.**

22. In September 2013, Dr. Jorelle R. Alexander, the System Director of Oral Health for the Cook County Health & Hospitals System, acknowledged the scheduling process for

dental appointments was ineffective; return appointments as well as appointments based on grievances were not being scheduled appropriately. (Plaintiff's Exhibit 6, Dr. Alexander Email.)

**ANSWER: Object, relevance. Plaintiff never had trouble getting a dental appointment at Cermak whenever he needed it. Deny as taken out of context as this was an internal memo to dentists so they could personally schedule walk-in patients every afternoon as they wished.**

23. In the year 2014, it was not the responsibility of dentists at the jail to schedule patients; Patient Scheduling was responsible for scheduling dental appointments. (ECF No. 51-4 at 11, 13-14, 20, 38, Watson-Montgomery Dep 32:16-33:5; 39:5-23; 42:2-18; 67:6-14; 141:8-17.)

**ANSWER: Admit that patient scheduling was responsible for scheduling most dental appointments but deny as worded insofar as it fails to account for the walk-in patients which the dentists can schedule as needed. (See e.g. Dkt #51-4 Ex. C Watson- Montgomery dep at 150:4-13.)**

24. No person within the dental practice group at Cermak has the ability to prioritize an inmate to be seen by an oral surgeon at Stroger and Dr. Watson-Montgomery is not aware of any medical doctor able to prioritize a referral by a Cermak dentist to be seen by an oral surgeon at Stroger. (ECF No. 51-4 at 14, Watson-Montgomery Dep 42:20-44:11.)

**ANSWER: Admit that Dr. Montgomery so testified.**

25. Patient Scheduling, in 2015, was staffed by four clerks who, since at least 2004, were responsible for scheduling patients for medical appointments. (Plaintiff's Exhibit 7, Vega Dep. at 14:19-15:21; Plaintiff's Exhibit 8, Williams Dep. at 23:7-24:14.)

**ANSWER:** **Admit.**

26. Maria Vega, one of the clerks in Patient Scheduling, has been assigned to the unit since April of 2011. (Plaintiff's Exhibit 7, Vega Dep. at 5:5-7.) Ms. Vega's highest level of education is a high school degree with some college. (*Id.* at 87:9-21.)

**ANSWER:** **Admit.**

27. Other than some on-the-job training, Ms. Vega was not provided any additional training regarding her role as a scheduler for medical appointments. (Plaintiff's Exhibit 7, Vega Dep. at 88:1-4.) As of March 2015, Cermak had not provided any training to Ms. Vega how to address a situation where a patient has a priority or urgent referral for a clinic appointment and Cermak Health Services does not have an available clinic appointment until two months in the future. (Plaintiff's Exhibit 7, Vega Dep. at 41:21-42:2.)

**ANSWER:** **Deny in so far as the evidence in support of the statement is not from this case and does not support the statement.** *McGee v. Dart* **14 CV 3495 pertains to a different case that involved orthopedic issues not dental issues. It should not be used in support of the summary judgment motion in this case.** *See, e.g*. *Hughes v. City of Chicago*, **673 F. Supp. 2d 641, 651 (N.D. Ill. 2009) ("At the summary judgment stage, a party may rely on deposition testimony from a separate action where the case involved the same parties and subject matter") (internal citations omitted). Without waiving that objection Admit that**

13

**she so testified but it was in reference to scheduling orthopedic appointments not dental appointments. (See Ex. 7 Vega deposition pp. 37-42)**

28. Ms. Vega testified Patient Scheduling was responsible for responding to dental grievances. (Plaintiff's Exhibit 7, Vega Dep. at 75:1-11.) In responding to a dental grievance, Patient Scheduling would either provide the inmate with a "date if it's available" or respond "that they have already [been] seen in a previous appointment." (Plaintiff's Exhibit 7, Vega Dep. at 76:17-23.) Grievances relating to other clinics, like the orthopedic clinic, are not addressed by Patient Scheduling, but are forwarded "directly to the doctor." (*Id.* at 75:12-16.)

**ANSWER: Deny. She testified that the scheduling department only "provides them with a date if it's available or that they have been already seen in a previous appointment." (Ex. 7 Vega dep 75: 17-21). The Department of Justice Report from the DOJ regarding dental in May 2014 lauds the response to the grievances by the dental department. (*United States v. Cook County*, Case No. 10 C 2946, Dkt #255 Group Ex O at p 66)**

29. When responding to an inmate grievance concerning a missed appointment date, Ms. Vega, a clerk in Patient Scheduling, does not investigate why a patient missed an appointment. (Plaintiff's Exhibit 7, Vega Dep. at 75:22-76:19.)

**ANSWER: Deny. The cited portion was a request regarding dermatology grievances not dental grievances. (Ex. 7 at 75:22-24, 76:1-19)**

30. At times, Ms. Vega receives grievances from inmates concerning not being seen in a Jail clinic who is identified in the queue. (Plaintiff's Exhibit 7, Vega Dep. at 77:12-16,

78:11-15.) The "queue" is a list of individuals who have been referred by a physician for a clinic, but have not been provided a specific appointment date by Patient Scheduling. (Plaintiff's Exhibit 7, Vega Dep. at 78:5-10; Plaintiff's Exhibit 8, Williams Dep. at 143:10-18.) It is possible that the next available clinic spot could be several months in the future. (Plaintiff's Exhibit 7, Vega Dep. at 79:7-9.)

**ANSWER:** **Deny. The extrapolation of snippets from her deposition in another case are taken out of context and have nothing to do with dental clinic scheduling. (Ex. 7 pp 77-83)**

31. Under the ADA, the Leighton ramp is considered a physical barrier and to overcome this barrier, a reasonable accommodation is for the correctional officer to push the wheelchair up and down the ramp. (Plaintiff's Exhibit 9, Gumm Dep 105:9-106:3; 109:19-111:22.)

**ANSWER:** **Admit.**

32. Plaintiff Riley was never assisted navigating the Leighton ramp. (ECF No. 51-2 at 21, Riley Dep 75:3-13.)

**ANSWER:** **Disputed. Plaintiff never filed a grievance about the ramps. Aver that if he wasn't pushed up or down the ramp it was because he didn't need the accommodation or he refused the offer from a Sheriff's officer. Plaintiff Riley can walk and only needs the wheelchair for long distances because his feet hurt. (Dkt #51-2Ex. A 9:4-25, 10:1-14).**

33. Since at least April 19, 2014, the Sheriff has been aware that bullpens adjacent to courtrooms at Leighton do not have handicap toilets. (Plaintiff's Exhibit 10, Banks Memo dated

19 APR 14.) When a detainee requires the use of a handicap toilet, the Sheriff was required, to transport the detainee to a public restroom. (*Id.*)

**ANSWER:** **Admit.**

34. Plaintiff made an oral request to use the ADA bathroom when attending court at Leighton on October 20, 2014, but about 15 minutes after a request was made to the Sheriff's ADA coordinator, plaintiff was unable to wait any longer and urinated on himself. (ECF No. 51-2 at 15, Riley Dep 49:4-17; ECF No. 51-2 at 81-93, Plaintiff's Grievance submitted October 22, 2014.)

**ANSWER:** **Deny. Plaintiff did not urinate on himself. He stood up from his wheelchair and urinated on the floor. (Dkt #51-2 Ex. A Riley dep at 54:18-25.)**

35. Watson-Montgomery has no explanation why plaintiff Riley had to wait from January 17, 2014 to August 29, 2014 to get tooth number 32 extracted. (ECF No. 51-4 at 38, Watson-Montgomery Dep 139:9-15.) After Dr. Watson-Montgomery made a referral to oral surgery, she had no control over when plaintiff would be seen by an oral surgeon (*id.* at 40, 146:19-147:1), was powerless to do anything to expedite plaintiff's evaluation by an oral surgeon (*id.* at 38, 140:17-21), and had no idea who was responsible for plaintiff to be timely seen and treated by an oral surgeon. (*Id.* at 39, 142:7-13.)

**ANSWER:** **Admit that Dr. Watson –Montgomery did not know why the oral surgery appointment for extraction did not occur until August and that she had no control over scheduling for a routine oral surgery extraction at another facility. She made sure he was initially seen by the oral surgeon at Stroger in March 2014 which was within two months of**

**her referral. (Dkt #51-4 page 118 of 132). In total, she made three referrals to the oral surgeon at Stroger; January 17, 2014, May 7, 2014 and May 9, 2017. (See Group Exhibit P attached and included hereto).**

36. Medical records from March 25, 2014 report plaintiff had a "chief complaint of pain in the lower right quadrant of his mandible." (ECF No. 51-6 at 3.)

**ANSWER:** Admit.

37. In 2013 and 2014, at least four other inmates at the Cook County Jail suffered dental pain because of the ineffective scheduling of dental care at the Cook County Jail:

    a. Jonathan Williams, waited years to be sent to Stroger for removal of a tooth that was causing him pain (Plaintiff's Exhibit 11, Williams Tr. 194-236; *Smentek v. Sheriff of Cook County*, No. 09 C 529, 2014 WL 7330792, at * 3 (N.D.Ill.2014).) During the time he waited for surgery he filed numerous HSR forms requesting pain medication and antibiotics to treat the tooth, but there were constant delays in treatment. (*Id.*; *Smentek*, 2014 WL 7330792, at *3.)

    b. Quintin Scott visited the dental clinic two days after experiencing tooth pain and was referred to Stroger for surgery and prescribed antibiotics and pain medication. (Plaintiff's Exhibit 12, Scott Tr. 310-11; *Smentek*, 2014 WL 7330792, at *3) More than six months later the teeth causing him pain were pulled at Stroger. (*Id.* at Tr. 322; *Smentek*, 2014 WL 7330792, at *3.)

  c.  Orlando Allen submitted two or three HSR forms and a grievance complaining of dental pain before he was seen. (Plaintiff's Exhibit 13, Allen Tr. 694-699; *Smentek*, 2014 WL 7330792, at *4) Allen visited the dental clinic about two months after his original request. (*Id.* at Tr. 700; *Smentek*, 2014 WL 7330792, at *4.)

  d.  John Saiger broke his wisdom tooth in April 2013 while at the Jail and was in pain. (Plaintiff's Exhibit 14, Saiger Tr. 385; *Smentek*, 2014 WL 7330792, at *4.) Despite a grievance, Mr. Saiger was not treated until January 19, 2014. (*Id.* at Tr. 394; *Smentek*, 2014 WL 7330792, at *4.)

**ANSWER:** **Deny. As the testimony attached indicates, Mr. Williams was put on the routine follow up by the oral surgeon because his tooth 17 was an impacted wisdom tooth that had no infection or swelling. (Ex.11 pp 8-10 testimony pp. 227:13-25 and 228:1-20. He was also seen 15 times by dental and had extractions, fillings and cleanings. Ex.11 pp 7-10, testimony p 217: 12-25, 2196-15, 229:1-16)**

  **Mr. Scott was seen by a PA and a dentist within 48 hours but he chose to have his tooth extracted at Stroger rather than the dental clinic. (Ex. 12-9 testimony p 337:6-25, 342:1-25) He was seen in the meantime by the dentist and doctors.**

  **Orlando Allen's did wait eight weeks to have his tooth pulled in the Spring 2013 when he moved divisions but he was seen and treated within 48 hours of his HSRF about his tooth pain in October 2013. (Ex. 13-4 to 13-6 testimony. pp 704:1-3, 711:9-17, 712:12-25. 13:1-10).**

**Finally, Plaintiff testified that that guys on his "wing" who had toothaches were getting the shot and "the tooth [was] coming right out"( Dkt #51-2, Ex. A Riley dep at 81:1-8.)**

Respectfully Submitted,

ANITA ALVAREZ

By: /s/ Maureen O. Hannon          By:/s/ Nicholas Cummings

Assistant State's Attorney          Assistant State's Attorney
Conflicts Counsel Unit              Torts and Civil Rights Division
69 W. Washington, Suite 2030        500 Richard J. Daley Center
Chicago, IL  60602                  Chicago, Illinois 60602
(312)  603-1424                     (312) 603-6638

## CERTIFICATE OF SERVICE

I, Maureen O. Hannon, certify that I served this document on the attorney(s) pursuant to CM/ECF electronic filing on July 27, 2016.

\s\ Maureen O. Hannon